# J. R. WARREN, Appellee, v. A. B. BRADLEY, Appellant.—284 S. W. (2d) 698.

Eastern Section. March 15, 1955.

Petition for Certiorari denied by Supreme Court, June 10, 1955.

452

Clay Walker, of Morristown, for appellant.

W. J. Barron, of Morristown, for appellee.

HALE, J.   J. R. Warren, claiming under the authority hereinafter set forth, filed suit to enjoin A. B. Bradley from making a connection with a sewer constructed by the Town of Morristown.   Decree for complainant, and defendant appeals.

The question:  May a municipal corporation, for a monetary consideration, turn over a portion of its sewer system to an individual and allow him to fix and collect, without limitation, tap charges from property owners in that area who desire to connect with such sewer?

On November 16, 1951, the Board of Mayor and Aldermen of the Town of Morristown adopted the following resolution:

"Whereas, the Department of Streets and Sewers recently has completed the construction of a sanitary sewer

with the necessary laterals on Hillcrest Drive in the Warren Addition and within the corporate limits of the Town of Morristown, the costs of said sewer and the laterals being $1215.00;

"And Whereas, James R. Warren, who is developing the Warren Subdivision, has agreed to pay the entire cost of said sewer including the cost of constructing the laterals, amounting to $1215.00, provided that he be given certain rights therein:

"Now Therefore, be it resolved by the Mayor and Aldermen of the Town of Morristown that the Mayor and Recorder be and they hereby are directed and authorized to execute, acknowledge, and deliver, on behalf of the Mayor and Aldermen of the Town of Morristown a written contract providing that in consideration of the payment of $1215.00 by him to said Town:

"(1) For a period of twenty years from November 16, 1951, the said James R. Warren, his heirs, devisees, and assigns, shall have the exclusive right and privilege to connect with said sanitary sewer recently constructed on Hillcrest Drive;

"(2) During said period of twenty years the Town shall exact no fees or charges of any kind from the said James R. Warren, his heirs, devisees, or assigns for the privilege of connecting with said sewer;

"(3) The said James R. Warren is granted the right to assign the privilege of connecting with said sewer and may charge any person to whom he may assign said privilege a consideration therefor;

"(4) Throughout said period of twenty years the Town will maintain a connection between the lower terminus of said sewer and the main sanitary sewer system of the Town, and will, during said period maintain and repair said sewer at its own expense."

On May 22, 1952, the parties, i. e., the Town and Warren, entered into the following contract:

"That in consideration of the payment by James R. Warren to the Town of $1115.00, the receipt of which is hereby acknowledged, said amount being the entire cost of the sanitary sewer and laterals recently constructed on Hillcrest Drive in the Warren Addition of the Town of Morristown, the same being located in the First Civil District of Hamblen County, Tennessee, and within the corporate limits of the Town, the Town does hereby grant and convey unto said James R. Warren, his heirs, devisees, and assigns, the following rights and privileges with respect to said sewer and laterals:

"(1) Until the sum of $1115.00 has been recovered the said James R. Warren, his heirs, devisees, and assigns, shall have the exclusive right and privilege to connect with said sanitary sewer recently constructed on Hillcrest Drive;

"(2) During said period the Town shall exact no fees or charges of any kind from the said James R. Warren, his heirs, devisees, or assigns for the privilege of connecting with said sewer;

"(3) The said James R. Warren is granted the right to assign the privilege of connecting with said sewer and may charge any person to whom he may assign said privilege a consideration therefor;

"James R. Warren will report to the 'Town' semi-annually as to the amounts he has collected and received.

"(4) Throughout said period of twenty years the Town will maintain a connection between the lower terminus of said sewer and the main sanitary sewer system of the Town, and will, during said period maintain and repair said sewer at its own expense."

It will be noted that the consideration named in the contract, $1.115, is $100 less than the sum named in the quoted resolution. This was due to the fact that after the resolution was adopted and prior to the execution of the contract a permit had been issued by the Town to one Otto Williams to connect with such sewer. Warren was to charge $100 for connection fee; therefore the contract price to him was abated by $100 to compensate for the Williams permit. The record does not show what is charged by the Town for sewer connections, but in the oral argument it was stated by Mr. Barron, representing appellee, that the charge was $7.50. The record does not show what Mr. Williams paid for his connection.

It will also be noted that the contract in (1) deviates from the resolution in that it undertakes to impose a limitation upon the amount, $1,115, to be "recovered" by Warren, and under (3) requires him to report to the Town "semi-annually as to the amounts he has collected and received", which apparently refers to connection charges.

After this contract was obtained Warren proceeded to charge a tap or connection fee of $100 from each property owner who desired connection. He also created a second subdivision on Hillcrest Drive to the north of and adjoining the subdivision mentioned in the quoted resolution and contract. Lots were sold in this second subdivision, but it is not clear that they are being served by this sewer, although such seems to be the inference. When complainant was asked if he collected from each purchaser of these lots in the second subdivision he replied, "What I collected was in the lot. I collected the total price for the lot." He was also vague about the amounts he had collected from persons in the first subdivision who connected with this sewer, saying he would have to "check

up to give you that figure" and that he would be afraid to make an estimate. There is nothing in the record to show that he ever made any statement to the Town as to the amounts received. His deposition was taken nearly two years after he made the contract of May, 1952.

The sewer line in question was built in the summer or fall of 1951. The material entering into it cost $1,215, paid by the Town. The labor cost, also furnished by the Town, is not shown. It is probable that it equalled or exceeded the cost of material if the general trend of construction costs apply.

The defendant Bradley owned a residence on lot No. 13 in this subdivision and had lived in it for some two or more years prior to the construction of this sewer. His premises were served by a septic tank. This became full and was causing offensive odors, thus making it desirable to obtain sewer connections. He personally and through his plumber made applications to the Town for a permit, but was refused because of the contract the Town had made with Warren. Warren demanded $100 for the connection fee, as he says, whereas Bradley claims $125 was demanded. At any rate, Bradley began to dig a ditch from his premises towards this sewer with the purpose of making a connection. Warren then filed the bill in question.

■■ We might add that the Town had in effect an ordinance declaring the use of surface closets and cesspools on premises abutting streets which contained sanitary sewers was injurious to the public health, and requiring such property owners, after notice, to install closets with sewer connection. Failure to comply was punishable by fine from $5 to $25. It is not shown that the use of this ordinance was contemplated against Bradley.

"The establishment and maintenance of a sewer system by a city is ordinarily regarded as an exercise of its police power. McQuillian, Sec. 1545." Patterson v. City of Chattanooga, 192 Tenn. 267, at page 275, 241 S. W. (2d) 291, at page 294. Also see Verran v. Town of Greeneville, 4 Tenn. App. 422.

In "granting permission for the use of its sewers in the first instance, and for the continuing use thereof, the municipality must at all times retain control, and any attempt by way of contract to deprive it of that control is void." 64 C. J. S., Municipal Corporations, Sec. 1805, p. 266.

This text is supported by the case of Ericksen v. City of Sioux Falls, 70 S. D. 40, 14 N. W. (2d) 89, at page 95, in which it is said:

"The supervision and regulation of the sewers is a police function of the city. Therefore, in granting permission for the use of the sewers in the first instance and for the continuing use thereof, the city must at all times retain control, and any attempt by way of contract to deprive the city of that control is void. The police power of the city cannot be bargained away by contract, but must at all times be available for use to meet such public needs as may arise. McQuillin, Municipal Corporations, 2d Ed Rev., Secs. 393, 1564."

The case of Weaver v. Canon Sewer Co., 18 Colo. App. 242, 70 P. 953, 954, involved the validity of an ordinance granting to an individual the exclusive rights for 20 years to construct a sewer system in the city. It was held that "public powers or trusts devolved by law or charter upon the council or governing body, to be exercised by it when and in such manner as it shall judge best, cannot be delegated to others." The ordinance was held to be void.

In McQuillin, ibid, 3rd Edition, Sec. ——, it is said:

"A municipality cannot surrender its power to control and regulate sewers and drains within its limits."

In Corpus Juris Secundum it is said:

"A municipal corporation cannot make a binding contract for the discharge of a purely public duty; and, unless the state has expressly and unequivocally empowered it to do so, it cannot make any contract interfering with the state's exercise of the police power." 63 C. J. S., Municipal Corporations, Sec. 979, p. 534.

"Ordinarily a municipal corporation may sell or otherwise dispose of property held for private or proprietary purposes, but may not do so in respect of property held for public or governmental purposes unless authorized by law." 63 C. J. S., Municipal Corporations Sec. 962, p. 510.

Illustrations concerning delegation of powers are to be found in two cases involving the Town of Morristown, one in Noe v. Mayor & Aldermen of the Town of Morristown, 128 Tenn. 350, 161 S. W. 485, where it was held that an attempted delegation of police power was void, the other in Lotspeich v. Town of Morristown, 141 Tenn. 113, 207 S. W. 719, where an attempted delegation of legislative power was nullified.

In Shelby County v. Memphis Abstract Co., 140 Tenn. 74, at page 85, 203 S. W. 339, at page 342, L. R. A. 1918E, 939, it was held that the county, in the absence of statutory authority, had no right to lease public property for private purposes and then very aptly commented:

"Any rule other than the one we declare would lead to entanglements and abuses against which the public should be protected as a matter of public policy. As pointed out by the Court of Civil Appeals, the mo-

ment rent is charged and collected, special privileges arise, and, too, in a place where equal privilege must prevail.''

This was quoted and approved in the case of Henry v. Grainger County, 154 Tenn. 576, at page 580, 290 S. W. 2, which nullified an attempted lease of a part of the courthouse yard for the use of a filling station.

We might cite a large number of cases to the effect that it is universally recognized that municipal corpora tions can exercise no powers which are not in express terms, or by reasonable intendment, conferred upon them, and hence have no power to rent municipal property to private persons, in the absence of a charter provision or statutory enactment empowering them to do so either in express terms or by necessary implication. But see annotations to 63 A. L. R. 614; and 133 A. L. R. 1241.

■ It is true that the Charter of the Town, Ch. 103, Acts 1903, gives it the right to own property, real and personal, ''and may sell, lease or dispose of such property for the benefit of the town; and to do all other acts touching the same, as natural persons:'' However, this right must be held limited to the property it holds in its proprietary, and not governmental, capacity. Nor does the right to contract give it unlimited power. Crocker v. Town of Manchester, 178 Tenn. 67, 156 S. W. (2d) 383.

■ Appellee urges that the case of Porter v. City of Paris, 184 Tenn. 555, 201 S. W. (2d) 688, is authority for the action taken in the instant case, saying ''the only material difference being therein the Court is dealing with parking meters and in the present case with a sewer line.'' There the primary question was the right to install parking meters, with the subordinate question of using the receipts from the meters until the company which furnished and installed them was paid. Here, we have a

sewer system which was installed and paid for by the town, and, as before pointed out, it probably cost around $2,500 if we assume the labor cost as much as the material. Defendant, as a taxpayer, contributed to this cost. As the owner of property abutting thereon he was privileged—if not required under the ordinance relating to cesspools—to connect therewith. For the sum of $1,115 the Town divested itself of control of this property for 20 years, other than to obligate itself for maintenance, and impliedly agreed that the said Warren might charge any property owner any sum that he might choose for the privilege of disposing of their sewage. It seems to us that the Town might with equal reason transfer to an individual the exclusive right to use certain streets of the town and allow him to collect whatever toll he might choose.

Appellee relies upon Sec. 4406.103 of the Supplement to Williams' Code, especially subsections (h), (k) and (m). This is taken from Chapter 183 of the Public Acts of 1945, which is captioned:

"An Act authorizing incorporated cities and incorporated towns of this State to construct, acquire, improve, extend, operate and maintain public works, undertakings and projects; prescribing the mode of procedure for and regulating the issuance and sale of bonds and other obligations to finance such works, undertakings and projects; providing for the payment of such bonds and other obligations; and authorizing agreements with the holders of such bonds and other obligations."

Section 2 thereof, included in Sec. 4406.103 of the Supplement to Williams' Code, is as follows:

"Every municipality shall have power and is hereby authorized:

"(a) To construct any public works project, within or without the municipality, or partially within and partially without the municipality.

"(b) To operate and maintain any public works project for its own purpose or for the benefit and use of its inhabitants and also to operate and maintain such public works project for the benefit and use of the municipality and persons, firms and corporations therein and persons, firms and corporations, including municipal corporations, which are situated or whose residences or places of business are situated outside the territorial boundaries of such municipality but within the state and within a radius of twenty (20) miles from the territorial boundaries of such municipality.

"(c) To accept from any federal agency grants for or in aid of the construction of any public works project.

"(d) To contract debts for the construction of any public works project, to borrow money, and to issue its bonds to finance such construction, and to provide for the rights of the holders of the bonds and to secure the bonds as hereinafter provided.

"(e) To assess, levy and collect unlimited advalorem taxes on all property subject to taxation to pay bonds, and the interest thereon, issued to finance any public works project, except bonds and the interest thereon, payable exclusively from the revenues of a public works project.

"(f) To fix, levy, and collect fees, rents, tolls, or other charges for the use of or in connection with any public works project, and, in the event any agreements with holders of bonds shall be made as hereinafter provided, to fix, levy, and collect such fees,

rents, tolls, and other charges in accordance with such agreements and subject thereto.

'(g)  To acquire by purchase, gift or the exercise of the right of eminent domain and to hold and dispose of any property, real or personal, tangible or intangible, or any right or interest in any such property, in connection with any public works project, whether or not subject to mortgages, liens, charges or other encumbrances, and to construct any public works project subject thereto, and whether within or without the municipality, or partially within and partially without the municipality.

" (h)  To make contracts and execute instruments containing such terms provisions and conditions as in the discretion of the governing body of the municipality may be necessary, proper or advisable for the purpose of obtaining a grant, loan or other financial assistance from any federal agency pursuant to or by virtue of any act for post war project aid; to make all other contracts and execute all other instruments necessary, proper or advisable in or for the furtherance of any public works project; and to carry out and perform the terms and conditions of all such contracts or instruments.

" (i)  To enter on any lands, waters and premises for the purpose of making surveys, soundings and examinations in or for the furtherance of any public works project.

" (j)  To subscribe to and comply with any act for post war project aid and any rules and regulations made by any federal agency with regard to any grants or loans, or both, from any federal agency.

" (k)  To perform any acts authorized under this act through, or by means of its own officers, agents

and employees, or by contracts with private corporations, firms or individuals.

"(*l*) To exercise, for the purpose of obtaining a grant, loan or other financial assistance from any federal agency pursuant to or by virtue of any act for post war project aid, any power conferred by this act independently or in conjunction with any other power or powers conferred by this act or heretofore or hereafter conferred by any other law.

"(m) To do all acts and things necessary or convenient to carry out the powers expressly given in this act."

It is not shown the Town acted under this authority, but, if so, we do not think this contemplated that a town might dispose of the property it held in its governmental capacity. Municipalities are trustees for their citizens and, as pointed out, if the right of sewer connection could be alienated to an individual, then by the same token any or all other municipal functions or property rights might be so alienated or delegated. We do not think such was the intention of the statute.

When the bill was filed in this cause the defendant was enjoined from making the connection. Later, the injunction was modified so as to allow him to make the connection upon giving bond in the sum of $250. Bond was furnished and the connection made. At the final hearing a decree was entered against him for $100 and cost. So far as is shown by the record the Town has made no objection to his use of the sewer. If a connection fee is charged by the Town to the citizens thereof we think that it is the duty of the appellant to tender to the Town the usual charge. As was said in 64 C. J. S., Municipal Corporations, Sec. 1805, p. 271:

"A municipal corporation may fix the charges for

using or connecting with its sewers, and the consumer impliedly agrees to pay them. The charges must be fair and reasonable, and not discriminatory; under most authorities they do not constitute a tax.''
See also Code Sec. 3695.1 et seq.

It is true that defendant was in the wrong in undertaking forcibly to make a connection. But it is likewise true that he in person as well as by his plumber had applied for permission to connect. The Town took the position that this was a matter between him and Warren. Perhaps he should have instituted suit to compel the issuance of the permit; but as the Town had washed its hands of the matter and as Warren had no right, title, interest or claim in this public property we cannot say that Bradley was in bad faith in undertaking this species of self help.

Under Sec. 3352 of the Code, Warren was chargeable with knowledge of the limitations imposed upon the Town. He paid out his money, some if not all of which has been recovered, but that is a question between him and the Town, which is not a party to this suit.

The decree below is reversed and the bill of the complainant dismissed, with cost against him and surety on bond.

Reversed and dismissed.

McAmis, P. J., and Howard, J., concur.