IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2003 Session

# THE TUCKER CORPORATION  v. THE CITY OF CLARKSVILLE, TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. C9-299     John H. Gasaway, III, Judge**

---

**No. M2002-00627-COA-R3-CV - Filed May 30, 2003**

---

This is an appeal seeking to overturn the action of the trial court in granting a motion for summary judgment in favor of the City of Clarksville in a suit wherein the plaintiff challenged the validity of an ordinance enacted by the defendant setting water and sewage connection fees based on the square footage of the heated and cooled living space of the house connected to those services.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as a Right; Judgment of the Circuit Court Affirmed and Remanded**

VERNON NEAL, Sp. J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J.M.S. and WILLIAM B. CAIN, J., joined.

James D. Kay, Jr., Nashville, Tennessee, for the appellant, The Tucker Corporation.

David Haines, Clarksville, Tennessee, for the appellee, The City of Clarksville, Tennessee.

## OPINION

The plaintiff, The Tucker Corporation, is a Tennessee Corporation primarily involved in the residential development and construction business in Montgomery County, Tennessee.  The City of Clarksville owns and operates a municipal water and sewage system.  The plaintiff filed an action against the defendant in May, 1993, seeking to declare Section 13-309 of the City's Codified Ordinance invalid alleging that the provisions thereof are arbitrary, capricious, unreasonable, confiscatory, and unconstitutional and further seeking to enjoin the City and any of its officers, agents, officials or employees from enforcing the provisions of Section 13-309.  The defendant responded by filing a motion for summary judgment which was granted by an order entered on February 4, 2002, dismissing plaintiff's claims against the defendant with prejudice.

Factual Background

In 1986 the City of Clarksville commissioned a study from the engineering firm of Barge, Waggoner, Sumner & Cannon to develop a comprehensive plan to make a provision for water and sewage facilities and services in Clarksville through the year 2005. The study and analysis was completed and the final draft of the plan was filed with the City in February, 1987.

The report drafted by Barge, Waggoner gave several analysis and recommendations relative to connection to the City's water and sewage system. In particular, the report recommended that the Clarksville City Council adopt some type of rate and fee schedule for water and sewer services that would take into account what was deemed to be the inequitable situation that would be created by charging all customers, both old and new, the same rates. The study found that the bonded debt of the Clarksville water system was approximately $14.7 million which was calculated to equate to $451 per equivalent residential customer. The study further concluded that the total bonded debt of the sewage system was $23.3 million which was calculated to equate to $1,590 per equivalent residential customer. Barge, Waggoner found that sewer rates in Clarksville were generally lower than other Tennessee communities of similar size. Inasmuch as Clarksville was a fast growing municipality, the study and analysis recommended that the new water and sewage connection fees be increased in a manner which would take into account the cost indebtedness of the present infrastructure. The report more fully stated in pertinent part as follows:

> . . . .
>
> The current fee schedule is less than the cost incurred by the City to make the tap. Ideally, tap fees should be sufficient to not only cover the cost of making the tap, but help pay for the existing treatment and piping system (or help pay for any expansion necessary in part to serve the new customer(s)).
>
> The existing rate payers have made a substantial investment in plant facilities, and having incurred costs to make water and sewer service to or near the area, which may be one reason why the area is being developed. The question arises, should the existing customers bear the burden of supplying the services to an area for the benefit of the new customers, or should the new customers bear their fair share?
>
> . . . .
>
> Clarksville's tap fees and policies should be modified so that new customers help pay for both the cost of local facilities and part of the infrastructure supplying the area. The objective should be fairness to all parties, both new and existing customers. The policy should be

directed toward preventing or reducing the inequity to existing customers that results when these customers must pay the increases in water rates that are needed to pay for added plant and line costs for new customers. Clarksville is facing a period of large and substantial growth. This growth will require the expansion of both the water treatment and sewer treatment plant, as well as extensive improvements in the water distribution and sewerage collection systems. Realistic and fair tap fees would allow these new customers to help pay for the improvements needed to serve them. Front end capital contributions would permit the use of a single rate schedule applicable to both existing and new customers, rather than different rates for different areas. New customers connecting to the system should be required to pay an amount similar to that which has already been paid by existing customers towards the invested capital funds.

The plan submitted by Barge, Waggoner showed the amount of connection fees that were reasonably necessary to accomplish the stated purposes. It was on that recommendation that the City adopted Ordinance 16-1987-88 effective November 1, 1987, which, among other things, fixed water and sewer fees for new connections. In 1991, the Clarksville City Council acting through the mayor appointed a committee to study the issue of water/sewer connection fees and to make recommendations to the City Council for funding the expanded facilities that would be needed in the coming years. The committee consisting of engineers, developers, homebuilders and others filed its report February 24, 1992. Among other things, the study committee recommended that all future permitted homes falling under the original ordinance guidelines should be assessed a water/sewer connection fee based on the heated and cooled living space expressed in units of square feet. As a result of that report, the Clarksville City Council adopted Ordinance 59-1991-92 in 1992 which is codified as Section 13-309 of the Official Code o the City of Clarksville. The ordinance provides that water and sewer connection fees for all new residential construction shall be based on the number of square feet of heated and cooled living area contained in the new constructions and set the new residential construction water connection fee at Twenty cents ($.20) per square foot and for new residential construction sewer connection fee at Thirty cents ($.30) per square foot. The connection fees suggested by the Barge, Waggoner report were far in excess of the fees ultimately adopted by the Clarksville City Council. The term "connection fee" as used in the Clarksville City Code refers only to a fee charged to defray the cost of adding new users to the system. The connection fee does not contain a charge for the developer or any other home builder tapping onto the system when that is done at the developer or builder's expense.

The document filed in the trial court by the City Comptroller states that from 1988 to October, 2001, the Clarksville Gas, Water and Sewer Department has collected a total of $6,915,658 in connection/tap fees and of that amount $4,677,200 has been returned to developers of off-site improvements in the way of rebate coupons. Developers receive credit for improvements they make to the water and sewer system which are unrelated to the property that they themselves are developing. In return, the City of Clarksville, Gas, Water and Sewer Department gives those

individuals a credit equal to the amount of the improvements. As a result thereof, the Gas, Water and Sewer Department has netted a total of $2,238,458 in connection fees for water and sewer services during this time period. From 1987 to October 17, 2001, the Clarksville Gas, Water and Sewer Department has incurred $97,305,214.35 in costs associated with water and sewer treatment facility expansion, all of which has been occasioned by increased demands on both systems as a result of population growth and attendant development.

## Standard of Review

The trial court found that based on the documents submitted, there is no genuine issue as to any material fact that the defendant was entitled to judgment as a matter of law.

The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. The court must take the strongest legitimate view of the evidence in favor of the nonmoving party giving all reasonable inferences in favor of that party and discarding all countervailing evidence. *Hamblen v. Davidson*, 50 S.W.3d 433 (Tenn.Ct.App. 2000). Once the party moving for summary judgment satisfies its burden of showing that there is no genuine issue of material fact, the burden then shifts to the nonmoving party to show that there is a genuine issue of material fact requiring submission to the trier of facts. *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575 (Tenn.Ct.App. 2000). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's granting of summary judgment. Our review of the granting of a motion for summary judgment is *de novo* on the record before this Court. See *In Re: Estate of Hamilton v. Morris*, 67 S.W.3d 786 (Tenn.Ct.App. 2001).

## Issues Presented

Two issues have been presented for review on this appeal which are: (1) whether the trial court erred in granting the defendant's motion for summary judgment on the plaintiff's claim that the connection fee assessed by the defendant is an unauthorized form of taxation and is *ultra vires*; (2) whether the trial court erred in granting the defendant's motion for summary judgment on the plaintiff's claim that the connection fee assessed by the defendant is discriminatory in violation of the Equal Protection Clause of the State Constitution and the United States Constitution.

## The Fee or Tax Issue

Municipalities may exercise only those express or necessarily implied powers delegated to them by the Legislature in their Charter or under Statutes. See *City of Lebanon v. Baird*, 756 S.W.2d 236 (Tenn. 1988) citing *Barnes v. City of Dayton*, 216 Tenn. 400, 410, 392 S.W.2d 813, 817 (1965); *Adams v. Memphis & Little Rock R.R. Co.*, 42 Tenn. 645, 654 (1866). In *Warren v. Bradley*, 39 Tenn. App. 451, 459, 284 S.W.2d 698, 702 (1995) the court stated:

> "It is universally recognized that municipal corporations can exercise
> no powers which are not in express terms, or by reasonable

intendment, conferred upon them, and hence have no power [to do an act], in the absence of a charter provision or statutory enactment empowering them to do so either in express terms or by necessary implication".

When a municipality fails to act within its charter under applicable statutory authority, the action is *ultra vires* and void or voidable. *Crocker v. Town of Manchester*, 178 Tenn. 67, 70, 156 S.W.2d 383, 384 (1941). Under Tennessee law, a municipal action may be declared *ultra vires* for either of two reasons: (1) because the action was wholly outside the scope of the city's authority under its charter or statute, or (2) because action was not undertaken consistent with the mandatory provisions of its charter or a statute. Thus the law recognizes a difference between the existence of a municipal power and the manner or mode of exercising municipal power legitimately. *City of Lebanon v. Baird*, 756 S.W.2d at 241.

Both state law and the Charter of the City of Clarksville expressly or impliedly authorizes the City to charge connection fees for new connections to the water and sewer systems. Tenn. Code Ann. § 7-34-104 titled Powers of municipalities provides in pertinent part as follows:

> (a) In addition to powers which it may now have, any municipality has the power under this chapter to . . . .

> > (2) Operate and maintain any public work for its own use or for the use and benefit of its inhabitants, and also operate and maintain such public works for the use and benefit of persons, firms and corporations (including municipal corporations and inhabitants thereof) whose residences or place of business are located outside the territorial boundaries of such municipality.

> > . . . .

> > (5) Prescribe and collect rates, fees and charges for the services, facilities and commodities furnished by such public works.

The term "Public works" is defined in Tenn. Code Ann. § 7-34-102(3) as any one (1) or combination of two (2) or more of the following: water, sewerage, gas or electric heat, light or power works, plants and systems or parking facilities, together with all parts thereof and appurtenances thereto including, but not limited to, supply and distribution systems, reservoirs, dams, sewage treatment and disposal work and generating plants.

A portion of the Environmental Protection Act dealing with water and sewage codified in Tenn. Code Ann. § 68-221-101 et seq., provides in § 68-221-210:

> § 68-221-210. Authority to levy and collect other charges. - (a) The municipality collecting the user's fee shall have in addition the authority to fix, levy and collect fees, rents, tolls or other charges in an amount necessary to provide for the maintenance and operation of sewage treatment works and payment of any indebtedness.
>
> (b) This authority shall be in addition to any other authority to set like fees or to levy taxes pursuant to any other statute or authority granted by the state.

The Charter of the City of Clarksville authorizes the imposition of necessary charges to provide utility services and provides that the City may own, operate and maintain a sewage disposal system and furnish the product. While the City of Clarksville has ample legislative authority to impose connection fees, it is uncontroverted that the City does not have authority to levy a tax for such purpose.

It has been consistently held that a tax is a revenue raising measure levied for the purpose of paying the government's general debts and liabilities and that a fee is imposed for the purpose of regulating a specific activity or for defraying the cost for providing a service or benefit to the party paying the same. See *City of Tullahoma v. Bedford County*, 938 S.W.2d 408 (Tenn. 1997) citing *Memphis Retail Liquor Dealers' Ass'n v. City of Memphis*, 547 S.W.2d 244, 245-46 (Tenn. 1977). The essential test to determine whether fees are or are not taxes is whether they are, or are not, paid into the general public treasury and disbursable for general public expenses. See *Memphis Natural Gas Co. v. McCanless*, 183 Tenn. 635; 194 S.W.2d 476 (1946).

In the case now before this Court, the revenues generated from the connection fees are not paid into the city's general fund but are deposited into a water, sewage and gas utility funds account. Those fees have not been levied nor used for the purpose of paying for the City's general debts and liabilities, but have, instead, been used solely for the purpose of defraying cost of providing service for the benefit of the party paying the fee by improving and upgrading the City's sewage and water systems. In view of the case law definition of what is a fee and what is a tax, we hold that the connection charge at issue constitutes a permissible fee and not a tax.

Equal Protection Challenge

The plaintiff next insists that the connection fee assessed by the defendant is discriminatory, in violation of the Equal Protection Clause of the State and United States Constitutions. In *Throneberry Properties v. Allen*, 987 S.W.2d 37 (Tenn.Ct.App. 1998), this Court held that equal protection may be offended by treating persons in the same category differently without justification and by passing laws of local application that violate or suspend a general law.

Both the Fourteenth Amendment to the United States Constitution and Article 1, Section 8 of our State Constitution known as the "Law of the Land" clause provide that equal protection requires that all persons in similar circumstances be treated alike, but it does not require "things which are different in fact or opinion to be treated in law as though they were the same". See *State of Tennessee v. Smoky Mountain Secrets, Inc.*, 932 S.W.2d 905 (Tenn. 1996); *Tigner v. State* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L. Ed. 1124 (1940); *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn. 1988). The concept of equal protection espoused by the federal constitution and our state constitution guarantees that "all persons similarly circumstanced shall be treated alike". See *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d 139 (Tenn. 1993) citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562 64 L. Ed. 989 (1920); *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L. Ed. 2d 786 (1982); *State ex rel. Department of Social Services v. Wright*, 736 S.W.2d 84 (Tenn. 1987). Conversely, it has been held that things which are different in fact or opinion are not required by either constitution to be treated the same. See *Plyler v. Doe*, supra, 457 U.S. at 216, 102 S.Ct. at 2394; see also *Tennessee Small School Sys. v. McWherter*, supra, 851 S.W.2d at 153 wherein the court said: "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States," and legislatures are given considerable latitude in determining what groups are different and what groups are the same." Id. "In most instances the judicial inquiry into the legislative choice is limited to whether the classifications have a reasonable relationship to a legitimate state interest". See *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d at 153 citing *State v. Southern Fitness and Health, Inc.*, 743 S.W.2d 160, 164 (Tenn. 1987); *Harrison v Schrader*, 569 S.W.2d 822, 825 (Tenn. 1978). In *Harrison v. Schrader*, 569 S.W.2d 822, 825-826 (Tenn. 1978), the court also found that the determinative issue is whether the facts show some reasonable basis for the disparate state action. The court stated as follows:

> Under this standard, if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it, the classification will be upheld.

The *Schrader* court further held that the test to be applied, is that the classification must rest upon a reasonable basis and that if it has a reasonable basis, it is not unconstitutional merely because it results in some inequality and that reasonableness depends on the facts of the case and no general rule can be formulated for its determination. The burden of showing that a classification is unreasonable and arbitrary is upon the individual challenging the statute and if any state of facts can reasonably be conceived to justify the classification or if the reasonableness of the class is fairly debatable, the statute must be upheld. See *Tennessee Small School Systems v. McWherter,* 851 S.W.2d at 154. If a classification is naturally and reasonably related to that which it seeks to accomplish, it has passed the rational basis test and meets the constitutional standards. See *Vogle v. Wells Fargo Guard Services*, 937 S.W.2d 856 at 858.

Conclusion

In the instant case, we hold that the connection fee at issue is a fee and not a tax and the classification of charges for connection fees assessed to customers of Clarksville's water and sewage system have a reasonable relationship to a legitimate city interest.  The fee is applied alike to all customers of the same class.  Assessment of the fee would not be unconstitutional even if it resulted in some inequality inasmuch as the rational basis test has been met.

In applying the standards and tests enumerated herein for determining whether there has been a violation of the state or federal constitution involving due process, we hold that the ordinance at issue is not violative of due process.

The judgment of the trial court is affirmed and this cause is remanded to the trial court for any further proceedings consistent with this opinion.  The costs of this appeal are assessed to the appellant, The Tucker Corporation.

_____